203 F.3d 1322 (Fed. Cir. 2000)
 IN RE INDEPENDENT SERVICE ORGANIZATIONS ANTITRUST LITIGATION CSU, L.L.C., (previously CSU HOLDINGS INC., COPIER SERVICES UNLIMITED, INC., and COPIER SERVICE UNLIMITED OF ST. LOUIS, INC.), Plaintiff-Appellant, and CREATIVE COPIER SERVICES, Plaintiff, and ACQUISITION SPECIALISTS, INC., TECSPEC, INC., CONSOLIDATED PHOTO COPY, INC., COPIER REBUILD CENTER, INC., CPO, LTD., GRADWELL COMPANY, INC., GRAPHIC CORPORATION OF ALABAMA, INTERNATIONAL BUSINESS EQUIPMENT, INC., LASER RESOURCES INC., LASER RESOURCES OF MINNESOTA, INC., LASER SOLUTIONS, INC., LASER SUPPORT AND ENGINEERING, INC., MARATHON COPIER SERVICE, INC., NATIONWIDE TECHNOLOGIES, INC., REPROGRAPHICS RESOURCES SYSTEMS, INC., SUNTONE INDUSTRIES, INC., TECHNICAL DUPLICATION SERVICES, INC., X-TECH SYSTEMS INC., XER-DOX INC., and XEROGRAPHIC COPIES SERVICES, INC., Plaintiffs,
v.
XEROX CORPORATION, Defendant-Appellee.
 99-1323
 United States Court of Appeals for the Federal Circuit
 Decided February 17, 2000
Rehearing for En Banc Denied: April 13, 2000.
 
 Appealed from: U.S. District Court for the District of Kansas Judge Kathryn H. VratilJohn G. Roberts, Jr., Hogan & Hartson, L.L.P., of Washington, DC argued for plaintiff appellant. With him on the brief were David G. Leitch and Jonathan S. Franklin. Of counsel on the brief were P. John Owen and A. Bradley Bodamer, Morrison & Hecker L.L.P., of Kansas City, Missouri.
 Peter K. Bleakley, Arnold & Porter, of Washington, DC, argued for defendant-appellee. With him on the brief were Jonathan I. Gleklen and Christopher F. Winters. Of counsel on the brief were C. Larry O'Rourke, Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P., of Palo Alto, California, and Peter W. Marshall, Xerox Corporation, of Stamford, Connecticut.
 Robert J. LaRocca, Ryan, Brown, McDonnell, Berger, Gibbons & LaRocca, of Philadelphia, Pennsylvania, for amicus curiae Creative Copier Services.
 Carter G. Phillips, Sidley & Austin, of Washington, DC, for amicus curiae Intellectual Property Owners Association. Of counsel on the brief was Joseph S. Miller.
 Richard H. Stern, Ablondi Foster, of Washington, DC, for amicus curiae American Intellectual Property Law Association.
 David F. Ryan, Fitzpatrick, Cella, Harper & Scinto, of New York, New York, for amicus curiae New York Intellectual Property Law Association. Of counsel on the brief were Bruce M. Wexler, Fitzpatrick Cella, Harper & Scinto, and Herbert F. Schwartz, Fish & Neave, of New York, New York.
 Mark A. Perry, Gibson, Dunn & Crutcher LLP, of Washington, DC, for amicus curiae Information Technology Industry Council. Of counsel on the brief was Joseph Kattan.
 Before MAYER, Chief Judge, ARCHER, Senior Circuit Judge, and PLAGER, Circuit Judge.
 MAYER, Chief Judge.
 
 
 1
 CSU, L.L.C. appeals the judgment of the United States District Court for the District of Kansas, dismissing on summary judgment CSU's claims that Xerox's refusal to sell patented parts and copyrighted manuals and to license copyrighted software violate the antitrust laws. See CSU, L.L.C. v. Xerox Corp., Civ. Action No. MDL-1021 (D. Kan. Jan. 3, 1999) (final judgment order). Because we agree with the district court that CSU has not raised a genuine issue as to any material fact and that Xerox is entitled to judgment as a matter of law, we affirm.
 
 Background
 
 2
 Xerox manufactures, sells, and services high-volume copiers. Beginning in 1984, it established a policy of not selling parts unique to its series 10 copiers to independent service organizations ("ISOs"), including CSU, unless they were also end-users of the copiers. In 1987, the policy was expanded to include all new products as well as existing series 9 copiers. Enforcement of this policy was tightened in 1989, and Xerox cut off CSU's direct purchase of restricted parts. Xerox also implemented an "on-site end-user verification" procedure to confirm that the parts ordered by certain ISOs or their customers were actually for their end-user use. Initially this procedure applied to only the six most successful ISOs, which included CSU.
 
 
 3
 To maintain its existing business of servicing Xerox equipment, CSU used parts cannibalized from used Xerox equipment, parts obtained from other ISOs, and parts purchased through a limited number of its customers. For approximately one year, CSU also obtained parts from Rank Xerox, a majority-owned European affiliate of Xerox, until Xerox forced Rank Xerox to stop selling parts to CSU and other ISOs. In 1994, Xerox settled an antitrust lawsuit with a class of ISOs by which it agreed to suspend its restrictive parts policy for six and one-half years and to license its diagnostic software for four and one-half years. CSU opted out of that settlement and filed this suit alleging that Xerox violated the Sherman Act by setting the prices on its patented parts much higher for ISOs than for end-users to force ISOs to raise their prices. This would eliminate ISOs in general and CSU in particular as competitors in the relevant service markets for high speed copiers and printers.
 
 
 4
 Xerox counterclaimed for patent and copyright infringement and contested CSU's antitrust claims as relying on injury solely caused by Xerox's lawful refusal to sell or license patented parts and copyrighted software. Xerox also claimed that CSU could not assert a patent or copyright misuse defense to Xerox's infringement counterclaims based on Xerox's refusal to deal.
 
 
 5
 The district court granted summary judgment to Xerox dismissing CSU's antitrust claims and holding that if a patent or copyright is lawfully acquired, the patent or copyright holder's unilateral refusal to sell or license its patented invention or copyrighted expression is not unlawful exclusionary conduct under the antitrust laws, even if the refusal to deal impacts competition in more than one market. The court also held, in both the patent and copyright contexts, that the right holder's intent in refusing to deal and any other alleged exclusionary acts committed by the right holder are irrelevant to antitrust law. This appeal followed.
 
 Discussion
 
 6
 The issue is whether the district court erred in granting Xerox's motion for summary judgment on CSU's antitrust claims. We review a grant of summary judgment de novo. See Petrolite Corp. v. Baker Hughes Inc., 96 F.3d 1423, 1425, 40 USPQ2d 1201, 1203 (Fed. Cir. 1996) (citing Meyers v. Asics Corp., 974 F.2d 1304, 1306, 24 USPQ2d 1036, 1037 (Fed. Cir. 1992)). Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. See id. (citing Transmatic, Inc. v. Gulton Indus., Inc., 53 F.3d 1270, 1274, 35 USPQ2d 1035, 1038 (Fed. Cir. 1995)).
 
 
 7
 As a general proposition, when reviewing a district court's judgment involving federal antitrust law, we are guided by the law of the regional circuit in which that district court sits, in this case the Tenth Circuit. See Nobelpharma AB v. Implant Innovations, Inc., 141 F.3d 1059, 1068, 46 USPQ2d 1097, 1104 (Fed. Cir. 1998). We apply our own law, not regional circuit law, to resolve issues that clearly involve our exclusive jurisdiction. See Pro-Mold & Tool Co. v. Great Lakes Plastics, Inc., 75 F.3d 1568, 1574-75, 37 USPQ2d 1626, 1631 (Fed. Cir. 1996). "Whether conduct in procuring or enforcing a patent is sufficient to strip a patentee of its immunity from the antitrust laws is to be decided as a question of Federal Circuit law." Nobelpharma, 141 F.3d at 1068, 46 USPQ2d at 1104; see Midwest Indus., Inc. v. Karavan Trailers, Inc., 175 F.3d 1356, 1360, 50 USPQ2d 1672, 1676 (Fed. Cir. 1999) (en banc in relevant part) ("Pro-Mold and Nobelpharma make clear that our responsibility as the tribunal having sole appellate responsibility for the development of patent law requires that we do more than simply apply our law to questions of substantive patent law. In order to fulfill our obligation of promoting uniformity in the field of patent law, it is equally important to apply our construction of patent law to the questions whether and to what extent patent law preempts or conflicts with other causes of action."). The district court's grant of summary judgment as to CSU's antitrust claims arising from Xerox's refusal to sell its patented parts is therefore reviewed as a matter of Federal Circuit law, while consideration of the antitrust claim based on Xerox's refusal to sell or license its copyrighted manuals and software is under Tenth Circuit law.
 
 A.
 
 8
 Intellectual property rights do not confer a privilege to violate the antitrust laws. See Intergraph Corp. v. Intel Corp., 195 F.3d 1346, 1362, 52 USPQ2d 1641, 1652 (Fed. Cir. 1999). "But it is also correct that the antitrust laws do not negate the patentee's right to exclude others from patent property." Id. (citation omitted). "The commercial advantage gained by new technology and its statutory protection by patent do not convert the possessor thereof into a prohibited monopolist." Abbott Lab. v. Brennan, 952 F.2d 1346, 1354, 21 USPQ2d 1192, 1199 (Fed. Cir. 1991). "The patent right must be 'coupled with violations of § 2', and the elements of violation of 15 U.S.C. § 2 must be met."[1] Id. (citations omitted). "Determination of whether the patentee meets the Sherman Act elements of monopolization or attempt to monopolize is governed by the rules of application of the antitrust laws to market participants, with due consideration to the exclusivity that inheres in the patent grant." Id. at 1354-55, 21 USPQ2d at 1199 (citations omitted).
 
 
 9
 A patent alone does not demonstrate market power. See id. at 1355, 21 USPQ2d at 1199. The United States Department of Justice and Federal Trade Commission have issued guidance that, even where it exists, such "market power does not 'impose on the intellectual property owner an obligation to license the use of that property to others.'" Intergraph, 195 F.3d at 1362, 52 USPQ2d at 1652 (citing United States Department of Justice and Federal Trade Comm'n Antitrust Guidelines for the Licensing of Intellectual Property 4 (1995)). There is "no reported case in which a court ha[s] imposed antitrust liability for a unilateral refusal to sell or license a patent . . . ." Id. (citing Image Technical Servs. v. Eastman Kodak Co., 125 F.3d 1195, 1216, 44 USPQ2d 1065, 1079 (9th Cir. 1996)). The patentee's right to exclude is further supported by section 271(d) of the Patent Act which states, in pertinent part, that "[n]o patent owner otherwise entitled to relief . . . shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having . . . (4) refused to license or use any rights to the patent . . ." 35 U.S.C. § 271(d) (1999) (emphasis added).
 
 
 10
 The patentee's right to exclude, however, is not without limit. As we recently observed in Glass Equipment Development Inc. v. Besten, Inc., a patent owner who brings suit to enforce the statutory right to exclude others from making, using, or selling the claimed invention is exempt from the antitrust laws, even though such a suit may have an anticompetitive effect, unless the infringement defendant proves one of two conditions. 174 F.3d 1337, 1343, 50 USPQ2d 1300, 1304 (Fed. Cir. 1999) (citing Nobelpharma, 141 F.3d at 1068, 46 USPQ2d at 1104). First, he may prove that the asserted patent was obtained through knowing and willful fraud within the meaning of Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 177, 86 S. Ct. 347 (1965). See Glass Equip. Dev., 174 F.3d at 1343. Or he may demonstrate that the infringement suit was a mere sham to cover what is actually no more than an attempt to interfere directly with the business relationships of a competitor. See id. (citing Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 144, 81 S. Ct. 523 (1961)). Here, CSU makes no claim that Xerox obtained its patents through fraud in the Patent and Trademark Office; the Walker Process analysis is not implicated.
 
 
 11
 "[I]rrespective of the patent applicant's conduct before the [Patent and Trademark Office], an antitrust claim can also be based on [an] allegation that a suit is baseless; in order to prove that a suit was within Noerr's 'sham' exception to immunity, [see Noerr, 365 U.S. at 144, 81 S. Ct. 523], an antitrust plaintiff must prove that the suit was both objectively baseless and subjectively motivated by a desire to impose collateral, anti-competitive injury rather than to obtain a justifiable legal remedy." Nobelpharma, 141 F.3d at 1071, 46 USPQ2d at 1107 (citing Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 60-61, 26 USPQ2d 1641, 1646 (1993)). "Accordingly, if a suit is not objectively baseless, an antitrust defendant's subjective motivation is immaterial." Id. at 1072, 46 USPQ2d at 1107. CSU has alleged that Xerox misused its patents but has not claimed that Xerox's patent infringement counterclaims were shams.
 
 
 12
 To support its argument that Xerox illegally sought to leverage its presumably legitimate dominance in the equipment and parts market into dominance in the service market, CSU relies on a footnote in Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451, 480 n.29, 112 S. Ct. 2072, 2089 n.29 (1992), that "[t]he Court has held many times that power gained through some natural and legal advantage such as a patent, . . . can give rise to liability if 'a seller exploits his dominant position in one market to expand his empire into the next.'" Notably, Kodak was a tying case when it came before the Supreme Court, and no patents had been asserted in defense of the antitrust claims against Kodak. Conversely, there are no claims in this case of illegally tying the sale of Xerox's patented parts to unpatented products. Therefore, the issue was not resolved by the Kodak language cited by CSU. Properly viewed within the framework of a tying case, the footnote can be interpreted as restating the undisputed premise that the patent holder cannot use his statutory right to refuse to sell patented parts to gain a monopoly in a market beyond the scope of the patent. See, e.g., Atari Games Corp. v. Nintendo of Am., Inc., 897 F.2d 1572, 1576, 14 USPQ2d 1034, 1037 (Fed. Cir. 1990) ("[A] patent owner may not take the property right granted by a patent and use it to extend his power in the marketplace improperly, i.e. beyond the limits of what Congress intended to give in the patent laws.").
 
 
 13
 The cited language from Kodak does nothing to limit the right of the patentee to refuse to sell or license in markets within the scope of the statutory patent grant. In fact, we have expressly held that, absent exceptional circumstances, a patent may confer the right to exclude competition altogether in more than one antitrust market. See B. Braun Med., Inc. v. Abbott Lab., 124 F.3d 1419, 1427 n.4, 43 USPQ2d 1896, 1902 n.4 (Fed. Cir. 1997) (patentee had right to exclude competition in both the market for patented valves and the market for extension sets incorporating patented valves).
 
 
 14
 CSU further relies on the Ninth Circuit's holding on remand in Image Technical Services that "'while exclusionary conduct can include a monopolist's unilateral refusal to license a [patent] or to sell its patented . . . work, a monopolist's 'desire to exclude others from its [protected] work is a presumptively valid business justification for any immediate harm to consumers.'" 125 F.3d at 1218, 44 USPQ2d at 1081 (citing Data General Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147, 1187, 32 USPQ2d 1385, 1417 (1st Cir. 1994)). By that case, the Ninth Circuit adopted a rebuttable presumption that the exercise of the statutory right to exclude provides a valid business justification for consumer harm, but then excused as harmless the district court's error in failing to give any instruction on the effect of intellectual property rights on the application of the antitrust laws. See id. at 1219-20, 44 USPQ2d at 1081. It concluded that the jury must have rejected the presumptively valid business justification as pretextual. See id. This logic requires an evaluation of the patentee's subjective motivation for refusing to sell or license its patented products for pretext. We decline to follow Image Technical Services.
 
 
 15
 We have held that "if a [patent infringement] suit is not objectively baseless, an antitrust defendant's subjective motivation is immaterial." Nobelpharma, 141 F.3d at 1072, 46 USPQ2d at 1107. We see no more reason to inquire into the subjective motivation of Xerox in refusing to sell or license its patented works than we found in evaluating the subjective motivation of a patentee in bringing suit to enforce that same right. In the absence of any indication of illegal tying, fraud in the Patent and Trademark Office, or sham litigation, the patent holder may enforce the statutory right to exclude others from making, using, or selling the claimed invention free from liability under the antitrust laws. We therefore will not inquire into his subjective motivation for exerting his statutory rights, even though his refusal to sell or license his patented invention may have an anticompetitive effect, so long as that anticompetitive effect is not illegally extended beyond the statutory patent grant. See Glass Equip. Dev., 174 F.3d at 1343, 50 USPQ2d at 1304. It is the infringement defendant and not the patentee that bears the burden to show that one of these exceptional situations exists and, in the absence of such proof, we will not inquire into the patentee's motivations for asserting his statutory right to exclude. Even in cases where the infringement defendant has met this burden, which CSU has not, he must then also prove the elements of the Sherman Act violation.
 
 
 16
 We answer the threshold question of whether Xerox's refusal to sell its patented parts exceeds the scope of the patent grant in the negative.[2] Therefore, our inquiry is at an end. Xerox was under no obligation to sell or license its patented parts and did not violate the antitrust laws by refusing to do so.
 
 B.
 
 17
 The Copyright Act expressly grants a copyright owner the exclusive right to distribute the protected work by "transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 106(3) (1996). "[T]he owner of the copyright, if [it] pleases, may refrain from vending or licensing and content [itself] with simply exercising the right to exclude others from using [its] property." Data General, 36 F.3d at 1186, 32 USPQ2d at 1416 (citing Fox Film Corp. v. Doyal, 286 U.S. 123, 127, 52 S. Ct. 546, 547 (1932)).
 
 
 18
 The Supreme Court has made clear that the property right granted by copyright law cannot be used with impunity to extend power in the marketplace beyond what Congress intended. See United States v. Loew's, Inc., 371 U.S. 38, 47-48, 83 S. Ct. 97, 103-04 (1962) (block booking of copyrighted motion pictures is illegal tying in violation of Sherman Act). The Court has not, however, directly addressed the antitrust implications of a unilateral refusal to sell or license copyrighted expression.
 
 
 19
 The Tenth Circuit has not addressed in any published opinion the extent to which the unilateral refusal to sell or license copyrighted expression can form the basis of a violation of the Sherman Act. We are therefore left to determine how that circuit would likely resolve the issue; the precedent of other circuits is instructive in that consideration. The Fourth Circuit has rejected a claim of illegal tying, supported only by evidence of a unilateral decision to license copyrighted diagnostic software to some but not to others. See Service & Training, Inc. v. Data General Corp., 963 F.2d 680, 686, 23 USPQ2d 1102, 1106 (4th Cir. 1992). In reaching this conclusion, the court recognized the copyright owner's exclusive right to "sell, rent, lease, lend, or otherwise distribute copies of a copyrighted work," id. (citing 17 U.S.C. § 106(3)), and concluded that "Section 1 of the Sherman Act does not entitle 'a purchaser . . . to buy a product that the seller does not wish to offer for sale.'" Id. (citing Jefferson Parish Hosp. Dist. v. Hyde, 466 U.S. 2, 24 n.40, 104 S. Ct. 1551 (1984)).
 
 
 20
 Perhaps the most extensive analysis of the effect of a unilateral refusal to license copyrighted expression was conducted by the First Circuit in Data General Corp. v. Gruman Systems Support Corp., 36 F.3d 1147, 32 USPQ2d 1385. There, the court noted that the limited copyright monopoly is based on Congress' empirical assumption that the right to "exclude others from using their works creates a system of incentives that promotes consumer welfare in the long term by encouraging investment in the creation of desirable artistic and functional works of expression. . . . We cannot require antitrust defendants to prove and reprove the merits of this legislative assumption in every case where a refusal to license a copyrighted work comes under attack." Id. at 1186-87, 32 USPQ2d at 1416. The court went on to establish as a legal standard that "while exclusionary conduct can include a monopolist's unilateral refusal to license a copyright, an author's desire to exclude others from use of its copyrighted work is a presumptively valid business justification for any immediate harm to consumers." See id. at 1187, 32 USPQ2d at 1417. The burden to overcome this presumption was firmly placed on the antitrust plaintiff. The court gave no weight to evidence showing knowledge that developing a proprietary position would help to maintain a monopoly in the service market in the face of contrary evidence of the defendant's desire to develop state-of-the-art diagnostic software to enhance its service and consumer benefit. See id. at 1188-89, 32 USPQ2d at 1418.
 
 
 21
 As discussed above, the Ninth Circuit adopted a modified version of this Data General standard. Both courts agreed that the presumption could be rebutted by evidence that "the monopolist acquired the protection of the intellectual property laws in an unlawful manner." Image Technical Servs., 125 F.3d at 1219, 44 USPQ2d at 1082 (citing Data General, 36 F.3d at 1188, 32 USPQ2d at 1418). The Ninth Circuit, however, extended the possible means of rebutting the presumption to include evidence that the defense and exploitation of the copyright grant was merely a pretextual business justification to mask anticompetitive conduct. See id. The hazards of this approach are evident in both the path taken and the outcome reached. The jury in that case was instructed to examine each proffered business justification for pretext, and no weight was given to the intellectual property rights in the instructions. See id. at 1218, 1220 n.12, 44 USPQ2d at 1082 n.12. This permitted the jury to second guess the subjective motivation of the copyright holder in asserting its statutory rights to exclude under the copyright laws without properly weighing the presumption of legitimacy in asserting its rights under the copyright laws. While concluding that the failure to weigh the intellectual property rights was an abuse of discretion, the Ninth Circuit nevertheless held the error harmless because it thought the jury must have rejected the presumptive validity of asserting the copyrights as pretextual. See id. at 1219-20, 44 USPQ2d at 1081-82. This is in reality a significant departure from the First Circuit's central premise that rebutting the presumption would be an uphill battle and would only be appropriate in those rare cases in which imposing antitrust liability is unlikely to frustrate the objectives of the Copyright Act. See Data General, 36 F.3d at 1187 n.64, 1188, 32 USPQ2d at 1417 n.64.
 
 
 22
 We believe the First Circuit's approach is more consistent with both the antitrust and the copyright laws and is the standard that would most likely be followed by the Tenth Circuit in considering the effect of Xerox's unilateral right to refuse to license or sell copyrighted manuals and diagnostic software on liability under the antitrust laws. We therefore reject CSU's invitation to examine Xerox's subjective motivation in asserting its right to exclude under the copyright laws for pretext, in the absence of any evidence that the copyrights were obtained by unlawful means or were used to gain monopoly power beyond the statutory copyright granted by Congress. In the absence of such definitive rebuttal evidence, Xerox's refusal to sell or license its copyrighted works was squarely within the rights granted by Congress to the copyright holder and did not constitute a violation of the antitrust laws.
 
 Conclusion
 
 23
 Accordingly, the judgment of the United States District Court for the District of Kansas is affirmed.
 
 Affirmed
 
 
 NOTES:
 
 
 [1]
 Section 2 of the Sherman Act, 15 U.S.C. § 2, prohibits monopolization or attempts to monopolize: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony. . . ."
 
 
 [2]
 Having concluded that Xerox's actions fell within the statutory patent grant, we need not separately consider CSU's allegations of patent misuse and they are rejected.