APPLERA CORPORATION and Roche Molecular Systems, Inc., plaintiffs,

v.

MJ RESEARCH INC. and Michael and John Finney, defendants.

No. 3:98 CV 1201 JBA.

United States District Court, D. Connecticut.

Dec. 22, 2004.

340

Brian M. Poissant, Bruce J. Barker, Pennie & Edmonds, Charles W. Bradley, Jennifer Gordon, Joseph Evall, Robert A. Cote, Stephen J. Lieb, John Josef Molenda, Patrick J. Hoeffner, Sharon Yang, Rita Lynn Berardino, Orrick, Herrington & Sutcliffe, Lawrence B. Goodwin, Chadbourne & Parke, Wendy Schechter, Heller Ehrman White & McAuliffe LLP, David J. Lender, Gianluca Morello, David Greenbaum, Weil, Gotshal & Manges, William J. Hone, Fish & Richardson, PC, New York, NY, Mary L. Azcuenaga, Heller Ehrman White & McAuliffe LLP, David Gersch, Asim Varma, Bertrand R. Lanciault, III, Jean C. Kalicki, Michael J. Klyce, Jr., Arnold & Porter, Washington, DC, James T. Shearin, Aimee Jennifer Wood, Pullman & Comley, Bridgeport, CT, Gwen P. Weisberg, Pullman & Comley, James Sicilian, Mario R. Borelli, Robin L. Smith, Day, Berry & Howard, Hartford, CT, Jennifer K. Lawson, Testa, Hurwitz & Thibeault, Boston, MA, Edward R. Reines, Matthew D. Powers, Paul Ehrlich, Weil, Gotshal & Manges, Redwood Shores, CA, for Plaintiffs.

A. Jason Mirabito, Brett N. Dorny, Geri L. Haight, Ivor R. Elrifi, John A. Harre, Joseph G. Blute, William A. Marino, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Joseph B. Darby, III, Greenberg & Traurig, Boston, MA, Albert L. Jacobs, Jr., Gerard F. Diebner, Joseph M. Manak, Greenberg Traurig, Christine Cora True-Frost, David A. Hoffman, John E. Beerbower, Latisha Thompson, Radu A. Lelutiu, Rudolf Koch, Cravath, Swaine & Moore, Daniel A. Ladow, Graham & James, Mary Morabito Rosewater, Schulte, Roth & Zabel, New York, NY, C. Allen Foster, David S Panzer, Kevin E. Stern, Timothy C. Bass, Greenberg Traurig, LLP, William C. Brashares, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, Washington, DC, Donna Nelson Heller, Harold Bolton Finn, III, Meghan A. Laganza, Patrick J. McHugh, Finn Dixon & Herling, Stamford, CT, for Defendants.

**Ruling on Motion for Summary Judgment of MJ Research, Inc. in Its Favor on The Claims of Monopolization, Attempted Monopolization and Conspiracy to Monopolize [Doc. # 1137] and on Plaintiffs' Cross Motion for Summary Judgment on MJ Research, Inc.'s Claims on Monopolization, Attempted Monopolization, and Conspiracy to Monopolize [Doc. # 1180]**

ARTERTON, District Judge.

Plaintiffs/counterclaim defendants Appl-

era Corp. ("Applera")[1] and Roche Molecular Systems, Inc. ("Roche"), and defendant/counterclaim plaintiff MJ Research Inc. ("MJ") have filed cross motions for summary judgment on MJ's claims of monopolization, attempted monopolization, and conspiracy to monopolize. For the reasons discussed below, summary judgment is granted for Applera.

■■■ The Court assumes the reader's familiarity with the facts of this case from prior rulings. *See infra* n. 2. The offense of monopolization under Section 2 of the Sherman Act has two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). Monopoly power is defined as "the power to control prices or exclude competition," and "may be inferred from the predominant share of the market." *Id.* (citation and internal quotation marks omitted). Possession of monopoly power violates the Sherman Act if it is obtained through exclusionary conduct, which is defined as that which "not only (1) tends to impair the opportunities of rivals, but also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 n. 32, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985) (quoting 3 P. Areeda & D. Turner, *Antitrust Law* 78 (1978)). "The purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market. The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). A claim of attempted monopolization requires the plaintiff to prove "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 99–100 (2d Cir.1998) (quoting *Spectrum Sports, Inc.*, 506 U.S. at 456, 113 S.Ct. 884). The offense of conspiracy to monopolize "requires proof of (1) concerted action, (2) overt acts in furtherance of the conspiracy, and (3) specific intent to monopolize." *Volvo N. Am. Corp. v. Men's Int'l Prof. Tennis Council*, 857 F.2d 55, 74 (2d Cir.1988) (citing *United States v. Consolidated Laundries Corp.*, 291 F.2d 563, 573 (2d Cir.1961)).

Thus, for each of the claimed Section 2 violations, MJ must prove that Applera had or was "dangerously close" to achieving monopoly power over the market, and that it engaged in exclusionary conduct, either alone or in concert with Roche. Addressing first the exclusionary conduct prong, MJ has identified the following conduct as improperly exclusionary: Applera adopted the thermal cycler "authorization" requirement in order to leverage its monopoly from PCR into the thermal cycler market; Applera's "authorization" requirement from 1992 through mid–1994 constituted illegal tying; Applera induced competitors to join its Supplier Authorization

1. On June 28, 2002, Applera Corporation and Perkin–Elmer ("PE") Corporation, its wholly owned subsidiary, entered into an agreement and liquidation plan in which PE Corporation was liquidated and the entirety of its assets, including intellectual property rights, was transferred to Applera Corporation. On June 3, 2003, this Court granted plaintiff's motion to amend the caption in this lawsuit to reflect the official change in Plaintiff's identity from "PE Corporation" to "Applera Corporation." *See* [Docs. # 664, 674]. For simplicity, this Court will refer to plaintiff as Applera, even when referring to pre–2002 events.

Program ("SAP") beginning in 1994, raising prices in the thermal cycler market in an unlawful price fixing conspiracy; the SAP imposed an unlawful total sales royalty; Applera refused to allow MJ to buy at retail prices "authorizations" to sell to its customers; Applera refused to license the PCR process to MJ's affiliates; Applera refused to unbundle Applera's apparatus patents from the PCR process patents; Applera disparaged MJ within the industry; and Applera's suit for contributory and induced infringement was a sham.

Much of the conduct MJ challenges as exclusionary has been raised in separately filed summary judgment motions or motions in limine, and addressed in prior rulings.[2] The conduct challenged as exclusionary that has not yet been addressed includes Applera's claimed disparagement of MJ, its refusal to deal, its leveraging, and the conduct from 1992 through mid–1994 that is challenged as illegal tying. MJ also makes new arguments regarding its claim of sham litigation. The Court will address each claim in turn.

## A. Sham Litigation

■ MJ devotes a large portion of its memorandum of law to its argument that

Applera threatened MJ with sham claims of contributory infringement and induced infringement, an issue that was decided in this Court's February 5, 2004 decision, see [Doc. # 883], and on which MJ has never moved for reconsideration. Since the issuance of the Court's February 5 decision, the jury has returned its verdict that MJ willfully induced infringement of Applera's process patents, a circumstance that should have put to rest MJ's assertion that Applera's infringement suit was a sham. MJ now argues, however, that "[b]ut for the requirement that end users must use 'authorized' thermal cyclers to perform PCR in Applera's fields, the allegations of induced infringement would not exist." Memorandum of MJ Research, Inc. in Support of its Motion for Summary Judgment [Doc. # 1139] at 20. It is a patent that gives rise to an infringement claim, not a license. A license merely makes the use of the patented technology lawful. A patent holder has significant freedom to choose to license or not to license, to set the royalty rates for the license, and to determine the manner in which the technology is licensed. The evidence presented at trial provided ample grounds for the jury's verdict.

2. See Rulings on Motion of MJ Research, Inc. for Summary Judgment Determining that Plaintiffs Have Engaged in Price Fixing; and Plaintiffs' Cross Motion for Partial Summary Judgment Determining that MJ Lacks Standing to Assert Horizontal Price Fixing and that Applera's Supplier Licenses Are Not a Price Fixing Arrangement and Opposition to Defendants' Motion for Summary Judgment Determining that Plaintiffs Have Engaged in Price Fixing [Doc. # 1248]; Ruling on Motion of MJ Research, Inc. for Summary Judgment Determining that Plaintiffs' Licensing Scheme Imposes a Total Sales Royalty and Plaintiffs' Cross Motion for Summary Judgment Seeking a Determination that Applera's Licensing Program does not Impose an Improper Total Sales Royalty and Thus is Not Patent Misuse [Doc. # 1253]; Rulings on Plaintiff's Motion for Summary Judgment on MJ's Claim that

Applera has Monopolized the Market for Thermal Cyclers by Unlawfully Packaging PCR Process Patent Rights with Instrument Patent Rights and Cross–Motion of MJ Research, Inc. for Summary Judgment in its Favor Determining that Plaintiffs Bundled Applera's Instrument and Their PCR Process Patents [Doc. # 1218]; Ruling on Motion in Limine to Preclude Evidence and Argument that Applera Packaged or Tied PCR Process Patent Rights With Thermal Cycler Patent Rights [Doc. # 1006]; Ruling on Motion in Limine to Exclude MJ's Evidence and Arguments Claiming PCR Rights are Tied to Authorized Thermal Cyclers [Doc. # 874]; Ruling on Motion in Limine to Exclude Evidence of and Arguments Based Upon Plaintiffs' Bringing of this Action and Threats of Similar Actions [Doc. # 883].

MJ also argues that the fact that Applera's contributory infringement claim was found to lack merit renders Applera's threats of litigation improper. The test for sham litigation includes first that "the *lawsuit* must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Prof'l. Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) (emphasis added). As this Court's February 5, 2004 decision found, "in light of the fact that Applera's core claims against MJ remain in this suit, MJ's attempt to segregate individual claims as baseless is perplexing." *See* [Doc. # 883] at 6 n. 10. More particularly, Applera's contributory infringement claim relied on the same process patents as its inducement claim. To this extent, MJ's reliance here on *Intel Corp. v. Via Tech, Inc.*, No. C–99–03062 WHA, 2001 WL 777085, at * 5 (N.D.Cal. Mar.20, 2001), is *unavailing*, because unlike in *Intel*, all of Applera's patents remained in the case, and Applera's core infringement claims regarding these patents were ultimately found meritorious.

## B. Disparagement

■ To prove monopolization based on disparagement, or misleading advertising and publicity, MJ must "overcome a presumption that the effect on competition of such a practice was de minimis. The presumption is based on the perception that, while '[t]here is no redeeming virtue in deception, ... there is a social cost in litigation over it,' " largely because the "the likelihood of a significant impact upon the opportunities of rivals is so small in most observed instances—and because the prevalence of arguably improper utterance is so great ...." *National Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs.*, 850 F.2d 904, 916 (2d Cir.1988) (citations and some internal quotation marks omitted). A plaintiff may overcome the de minimis presumption "by cumulative proof that the representations were [1] clearly false, [2] clearly material, [3] clearly likely to induce reasonable reliance, [4] made to buyers without knowledge of the subject matter, ■ continued for prolonged periods, and ■ not readily susceptible of neutralization or other offset by rivals." *Id.* (citations and internal quotation marks omitted).

■ MJ's evidence of disparagement consists of Applera's publication of the fact that MJ thermal cyclers were unlicensed and of its position that their use infringed Applera's patents[3] and Applera's statements that were critical of MJ thermal

3. *See* Letter from Katie McBain, Licensing Associate, PE Applied Biosystems to Harold Naylor, Qualicon, Feb. 16, 1998 [Doc. # 1140, Ex. 15] ("MJ Research is a thermal cycler supplier that refuses to respect PE's various patent rights to PCR, which include the basic PCR process claims, apparatus claims, PCR system claims and automated method claims (non-U.S.)."); Letter from Katie McBain to Larry Toffany, Director, Genelogic, Feb. 16, 1998 [Doc. # 1186, Ex. 19] ("MJ is a thermal cycler manufacturer that has elected not to respect our patent rights relating to PCR (basic PCR process claims, instrument claims and PCR system claims)."); Letter from Katie McBain, Licensing Association PE to Lauren Neal, National Institutes of Health, Aug. 18, 1997 [Doc. # 1140, Ex. 19] ("I received your letter of June 11, 1997 concerning the end user Thermal Cycler Agreement we have offered to Dr. Robert Sobol at NIEHS .... Your supplier, MJ Research, is one of a few suppliers who have refused to obtain PCR rights for their thermal cycler customers. MJ's refusal to accept its responsibility does not absolve its customers—that is, you—from the need for a license, because you directly infringe the process patents. MJ appears to agree that you have a responsibility.... In addition to the PCR process patents, there are also apparatus patents.... Since we offer combined process and apparatus rights at a

cyclers' Peltier system of heating and cooling.[4] This evidence fails to satisfy the first, most fundamental, element necessary to overcome the presumption against disparagement claims—that the publication be clearly false. In light of the jury's findings of infringement, and this Court's earlier ruling that Applera's infringement claims were not objectively baseless, MJ's claim regarding the falsity of Applera's publication that MJ infringed its patents is meritless. Moreover, MJ has never disputed that it did not have a license from Applera, and that therefore its customers

considerable savings over separate agreements, we sent you a combined-rights agreement."); Letter from Katie McBain to Cynthia Taves, Pel–Freez Clinical Systems, Mar. 27, 1998 [Doc. # 1140, Ex. 20] ("On October 13, 1997 PE Applied Biosystems sent you an end user Thermal Cycler Agreement that covers both an authorization under the PCR process patents and a license under instrument apparatus patents which, based on the description of your MJ Research thermal cycler, we feel you need."); Fax from Frank Langley, Managing Director, Pel–Freez Clinical Systems, to MJ Research, Apr. 23, 1998 [Doc. # 1140, Ex. 20] ("I have concerns about making any additional payments [to Applera] when I thought our obligations were completed through the purchase of the instrument from you and the additional payment that was made to MJ Research."); E-mail from John Hansen, MJ Research, Sept. 24, 1998 [Doc. # 1140, Ex. 17] (explaining that Dr. Goldfischer of Albert Einstein University decided not to use MJ thermal cyclers "due to the potential legal problems entailed."); Declaration of Jil Tardiff, Feb. 14, 2004 [Doc. # 1140, Ex. 18] at ¶ 13 ("Yeshiva University would not let me get another MJ machine. We had a lot of email correspondence on the question. There was some issue with machines needing to be 'authorized' for PCR. That was the first I had heard of it. The University never asked if I was willing to pay for an authorization.").

4. *See* E-mail from Christine Li to Michael Finney, Apr. 19, 1992 [Doc. # 1186, Ex. 20] ("The Cetus [Applera's predecessor] guy was very negative about your machines ... [He] said that he heard from a lot of his customers that they were unsatisfied with the MJ machines and were returning them to get Cetus machines. In addition, he said that the peltier system you people were using were not standing up to constant use. If one used the PCR machine every day for 2 years, the MJ machine would break down whereas the Cetus machine was much more reliable because of their way of cooling/heating."); Telefax from Winfriend Duven, Biozym to John Finney, Chris Littlefeld, MJ Research [Doc. # 1186, Ex. 21] ("attached please find a letter which has been sent to the chief purchase officer of the German Cancer Research Institute (DKFZ) by Perkin Elmer / Applied Biosystems Germany as an argumentation guide against the MJ Cycler PTC 200. The following is a Translation of the points of this letter. 1. Block exchange of the PTC 200 according to customer information not easy and will usually not be performed. 2. If the Customer changes the block it is not calibrated any longer. 3. The heated lid turns off if the instrument cools down. This indicates, that the Peltiers are too weak ... Systems based on Peltiers are still getting old continuously... "); Perkin Elmer Cetus 1991 Publication "Biofeedback" [Doc. # 1186, Ex. 23] ("Peltier units (thermoelectric heat pumps =THP) serve as the means for heating and cooling a number of competitive thermal cyclers e.g. Coy (cooling only), MJ Research ... When Perkin Elmer Cetus were developing the original DNA thermal Cycler back in 1986, THPs were tested as a means to heat and cool the sample block. Unfortunately the results were very disappointing as the THP would fail after 100–200 hours of repeated thermal cycling ... Today, however, there are new thermoelectric devices on the market which may be different to the 1986 models. These have all been investigated and although there are some improvements in the expected lifetimes of some of these THPs, the mechanical stress problem still exists. There still does not appear to be a reliable thermoelectric heat pump which can be used for rapid cycling of the temperatures required in PCR."); Fax cover page from Fenton Williams (Applera) to Nick Samara (Applera), January 24, 1991 [Doc. # 1183, Ex. 14] ("I don't have an article on Peltier failures. (In fact one article praises them). We have contacted Peltier manufacturers and they advise against cycling or high temp or low temp uses. The MIS attached should not be given to customers, but summarizes our findings.").

would need to obtain their own end user licenses to perform PCR. In this context, MJ's evidence that some customers learning of MJ's patent dispute with Applera and its lack of a license became concerned about the legal problems that might result if they bought an MJ cycler, and thereafter refused to buy MJ thermal cyclers, even if they would have otherwise preferred MJ's machines, does not give rise to a cognizable disparagement claim.[5]

MJ's claims regarding Applera's disparagement of Peltier-based heating and cooling systems are similarly unavailing. The evidence MJ has presented includes internal Applera reports or communications that refer to a 1986 internal study in which Applera found that the Peltier devices were not as reliable as other means of heating and cooling. The documents state that in 1991, Applera renewed its testing and found "some improvements" in the Peltier devices, but that "the mechanical stress problem still exists." Perkin Elmer Cetus 1991 Publication "Biofeedback" [Doc. # 1186, Ex. 23]. MJ has provided no evidence that the cited 1986 and 1991 studies were shams, or, in light of these cited studies, that Applera's later communications to potential thermal cycler customers were clearly false at the time they were sent. In reaching for support for its claim that false statements were made, MJ selectively quotes from a fax cover page sent between two Applera employees acknowledging both that the employee lacked any article referencing Peltier failures and that one article contained a favorable reference to Peltier devices. The fax

cover page, however, references Applera's communication with Peltier manufacturers and their advice against "cycling or high temp or low temp uses," and an attachment that summarizes Applera's investigation. *See* Fax cover page from Fenton Williams to Nick Samara, January 24, 1991 [Doc. # 1183, Ex. 14]. This fax does not contradict Applera's claim about the results of its internal studies on the long-term reliability of Peltier technology in thermal cyclers.

MJ maintains that the de minimis presumption should not be applied because its disparagement claim forms only one part, not the entirety, of its monopolization claim against Applera. Although acts taken together may prove a monopolization claim even where they would be insufficient if viewed only in isolation, MJ's disparagement claim fails because it has failed to identify any false statements that could support a disparagement claim, not because MJ has failed to prove that the disparagement is exclusionary.

## B. Refusal to Deal

 MJ's next argument centers on Applera's refusal to allow MJ to distribute end user licenses for Applera's patents to MJ's customers, and Applera's ultimate refusal to sell end user licenses to MJ for its own internal performance of PCR on thermal cyclers. "[A]s a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he

---

5. In its reply memorandum, MJ claims as a "clearly false" statement Applera's letter to an end user which states, "We feel that requests such as yours are not based on a good-faith evaluation that only some rights are needed but rather are calculatingly made on the assumption that PE will not sue for only hundreds of dollars to enforce the patents not being respected. While such a decision is not mine to make, I must tell you that I am taken aback to see DuPont join in this game." Letter from Katie McBain, Applera to Harold Naylor, Qualicon, Feb. 16, 1998 [Doc. # 1140, Ex. 15]. This statement does not disparage MJ or its products.

will deal.' " *Verizon Communications Inc. v. Law Offices of Curtis and Trinko, LLP,* 540 U.S. 398, 124 S.Ct. 872, 879, 157 L.Ed.2d 823 (2004) (quoting *United States v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992 (1919)). The right to refuse to deal with a rival is not unqualified, however. *See Aspen Skiing,* 472 U.S. at 601, 105 S.Ct. 2847 (upholding jury verdict finding monopolization where defendant changed longstanding business practice and refused to participate in multiday, four mountain ski pass with rival, instead offering multi-day pass only for the three mountains it owned); *Verizon Communications,* 124 S.Ct. at 879 (characterizing Aspen Skiing as the "outer boundary of § 2 liability"). As MJ frames its refusal to deal claim, Applera's refusal to license MJ was exclusionary because it denied MJ access to an essential facility, and because it constituted a change in a long-standing business practice analogous to that proscribed by the Supreme Court in *Aspen Skiing.*[6]

■■■ Resolution of this issue is controlled by the Federal Circuit's decision in *In re Independent Service Organizations Antitrust Litigation,* 203 F.3d 1322 (Fed. Cir.2000).[7] In that case, Xerox refused to sell or license patented parts for its copiers to independent service organizations, unless they were also end-users of the copiers. The Federal Circuit noted that there is "no reported case in which a court ha[s] imposed antitrust liability for a unilateral refusal to sell or license a patent," and reasserted that "the antitrust laws do not negate the patentee's right to exclude others from patent property." *Id.* at 1325, 1326 (citations and internal quotation marks omitted). Moreover, as *Independent Service Organizations* points out, section 271(d) of the Patent Act provides that "[n]o patent owner otherwise entitled to relief ... shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having ... (4) refused to license or use any rights to the patent ..." *Id.* at 1326 (quoting 35 U.S.C. § 271(d)). The Federal Circuit concluded:

> In the absence of any indication of illegal tying, fraud in the Patent and Trademark Office, or sham litigation, the patent holder may enforce the statutory right to exclude others from making, using, or selling the claimed invention free from liability under the antitrust laws. We therefore will not inquire into his subjective motivation for exerting his statutory rights, even though his refusal to sell or license his patented invention may have an anticompetitive effect, so long as that anticompetitive effect is not illegally extended beyond the statutory patent grant.

*Id.* at 1327–28.

■■■ Having already determined that the limited exceptions recognized by *Inde-*

---

6. Denial of access to an essential facility may constitute exclusionary conduct in violation of Section 2 of the Sherman Act where there is: "(1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility." *MCI Communications v. American Tel. & Tel. Co.,* 708 F.2d 1081, 1132–33 (7th Cir.), cert. denied, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983); *see also Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.,* 902 F.2d 174, 179 (2d Cir.

1990) (approving of *MCI* test). The Supreme Court has neither recognized nor repudiated the essential facilities doctrine. *See Verizon Communications,* 124 S.Ct. at 880, 124 S.Ct. 872.

7. "Whether conduct in procuring or enforcing a patent is sufficient to strip a patentee of its immunity from antitrust laws is to be decided as a question of Federal Circuit law." *Nobelpharma AB v. Implant Innovations, Inc.,* 141 F.3d 1059, 1068 (Fed.Cir.1998).

*pendent Service Organizations* do not apply here, the Court concludes that evidence of Applera's refusals to provide end user licenses to MJ cannot show improper exclusion. To find a patent an "essential facility" to which Applera must provide access would subvert the plain meaning and purpose of the Patent Act. MJ's argument—that Applera's patent is not deserving of protection because MJ wished merely to buy blocks of end user authorization licenses to sell to its customers, an act that would not infringe Applera's patents—is unpersuasive. As the jury has determined, MJ infringed Applera's process patents by, *inter alia*, promoting its thermal cyclers for PCR use. MJ has identified no authority supporting its argument that Applera was required to acquiesce to MJ's desire to sell *end user* licenses for Applera's patented processes, a scheme making MJ Applera's agent, not licensee, and in which MJ would obtain no immunity from infringement liability.[8]

MJ's reliance on *Aspen Skiing* is similarly unavailing. MJ argues by analogy to *Aspen Skiing* that Applera " 'elected to make an important change in a pattern of [licensing] that had originated in a compet-

itive market and had persisted for several years,' " Memorandum of MJ Research, Inc. in Support of its Motion for Summary Judgment on the Claims of Monopolization, Attempted Monopolization and Conspiracy to Monopolize [Doc. # 1139] at 15 (quoting *Aspen Skiing*, 472 U.S. at 603, 105 S.Ct. 2847). But in *Aspen Skiing*, the change in policy was one of dealing with its competitor to refusing to deal with it—a change in policy sufficiently shown to lack a business justification to support the jury's verdict. Here, in contrast, the change in policy to which MJ refers is not one of Applera's sudden refusal to license MJ after a prior history of licensing; rather, the change consisted of Applera's move from licensing the reagents necessarily used in the PCR process (as to which MJ was not licensed in its capacity as a supplier) to licensing the performance of PCR through end user and thermal cycler supplier "authorization" programs. Under the new licensing scheme, Applera actively *sought* to license MJ as a supplier.[9]

## C. Monopoly leveraging

 Under the theory of monopoly leveraging,[10] it is improper to "use [ ] mo-

8. MJ appears to define the "essential facility" as the "end users 'authorizations,' " *see* Memorandum of MJ Research, Inc. in Support of its Motion for Summary Judgment on the Claims of Monopolization, Attempted Monopolization and Conspiracy to Monopolize [Doc. # 1139] at 14. The Court fails to see how defining the facility as the end user license to practice the patented technology, or as the ability to sell such a license, would remove this issue from the realm of the Patent Act and the "due consideration to the exclusivity that inheres in the patent grant." *In re Independent Service Organizations Antitrust Litigation*, 203 F.3d 1322, 1325 (Fed.Cir.2000) (citation and internal quotation marks omitted).

9. MJ does not argue as an *Aspen Skiing* analogy Applera's 2001 refusal to sell an MJ affiliate an end user license for its internal per-

formance of PCR on a thermal cycler, after its prior practice of licensing MJ to perform PCR internally. Applera has offered as its justification for these refusals its concern that MJ was trying to transfer those end user licenses to MJ's customers and not simply using them for internal use. In any event, given that *Aspen Skiing* was not concerned with intersection of patent and antitrust law, and the Supreme Court's later caution that *Aspen Skiing* represents the "outer boundary" of Sherman Act Section 2 liability, *see Verizon Communications*, 124 S.Ct. at 879, this Court declines to read *Aspen Skiing* so expansively to cover the refusal to license situation at issue here.

10. Although monopoly leveraging is an independent cause of action, MJ states that it does not argue monopoly leveraging as an inde-

nopoly power in one market to strengthen a monopoly share in another market." *Virgin Atlantic Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 272 (2d Cir. 2001).[11] As the Supreme Court explained in *Verizon Communications*, 124 S.Ct. at 883 n. 4, a claim for monopoly leveraging "presupposes anticompetitive conduct." MJ argues that the SAP constitutes improper monopoly leveraging, because it sought to enlarge Applera's patent grant and achieve "control over the supply of unpatented material." *Carbice Corp. of. Am. v. Am. Patents Dev. Corp.*, 283 U.S. 27, 33, 51 S.Ct. 334, 75 L.Ed. 819 (1931). Distinct from its tying claim, MJ here claims that any licensing plan designed so that the licenses to use a product run with the product, and not with the user, is improper where the product is a "staple" good. This argument—that a patent holder may not derive revenue from licensing the sales of staple goods—also forms the core basis for its motion for summary judgment on patent misuse.

MJ relies on a series of Supreme Court cases preceding the development of the modern tying antitrust doctrine, in which the Supreme Court fleshed out the circumstances in which a patent holder would be found to exceed the scope of its patent by licensing unpatented supplies. In *Carbice Corp.*, the Dry Ice Corporation, a manufacturer of solid carbon dioxide, patented an

invention for "a particular kind of package employing solid carbon dioxide in a new combination," and required that only Dry Ice dioxide be used in the patented package. When Carbice, a competing manufacturer of solid carbon dioxide, sold its products to customers knowing that they would use the carbon dioxide in transportation packages like those described in Dry Ice's patent, Dry–Ice sued for contributory infringement. The Supreme Court concluded that the patent holder "may not exact as the condition of a license that unpatented materials used in connection with the invention shall be purchased only from the licensor .... [T]o permit the patent-owner to 'derive its profit, not from the invention on which the law gives it a monopoly, but from the unpatented supplies with which it is used' is 'wholly without the scope of the patent monopoly.'" *Id.* at 31–32, 51 S.Ct. 334 (citation omitted).

Relatedly, in *Leitch Mfg. Co. v. Barber Co.*, 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371 (1938), the Barber Company and Leitch Manufacturing were competing manufacturers of bituminous emulsion, an unpatented staple article of commerce. Barber was the owner of a process patent covering the use of this emulsion in a method for retarding evaporation during curing in the construction of cement concrete roads. Barber adopted "a method of

pendent basis for Section 2 relief. Instead, MJ appears to use the term "monopoly leveraging" in a more general descriptive sense as a form of exclusionary conduct, and relies on caselaw finding patent misuse where a patent holder derives profit, "not from the invention on which the law gives it a monopoly, but from the unpatented supplies with which it is used." *Carbice Corp. of America v. American Patents Development Corp.*, 283 U.S. 27, 31–32, 51 S.Ct. 334, 75 L.Ed. 819 (1931).

**11.** "[U]ncertainty exists as to the continued scope of a monopoly leveraging claim as an independent cause of action in light of the

Supreme Court's opinion in *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993)." *See Virgin Atlantic Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 272 (2d Cir.2001). The Supreme Court clarified in *Spectrum Sports*, 506 U.S. at 459, 113 S.Ct. 884, that there must be a "dangerous probability of success" in monopolizing a second market. Under earlier Second Circuit precedent, it would be "a violation of § 2 to use monopoly power in one market to gain a competitive advantage in another, even without an attempt to monopolize the second market." *See Virgin Atlantic*, 257 F3d at 272 (describing earlier precedent).

doing business which is the practical equivalent of granting a written license with a condition that the patented method may be practiced only with emulsion purchased from it." *Leitch Mfg.,* 302 U.S. at 460–61, 58 S.Ct. 288. The Supreme Court found that "the sole purpose to which the patent is put to use is thereby to suppress competition in the production and sale of staple unpatented material for this use in road building." *Id.* at 461, 58 S.Ct. 288. Relying on *Carbice,* the Supreme Court concluded, "every use of a patent as a means of obtaining a limited monopoly of unpatented material is prohibited. It applies whether the patent be for a machine, a product, or a process. It applies whatever the nature of the device by which the owner of the patent seeks to effect such unauthorized extension of the monopoly." *Id.* at 463, 58 S.Ct. 288.

Unlike *Carbice,* however, in which the patent covered only the "manufacture" of the packaging system, and therefore did not cover the use of dry ice in a transportation package, here Applera's process patent covered the performance of automated PCR, i.e. the use of a thermal cycler. Moreover, unlike *Leitch,* Applera did not, through its SAP, require users of its PCR process patent to perform PCR on *Applera* thermal cyclers. Thus, so long as Applera's licensing scheme charged for the use of its patented process, and no more, it remained within the scope of its patent grant.[12]

The Court finds no support for MJ's proposition that it is unlawful, even in the absence of a tie or improper total sales royalty, to charge a license fee that is measured by the sales of staple items of commerce. The jury determined that MJ was inducing infringement of Applera's process patents through its activities related to the sale of its thermal cyclers that encouraged its consumers to use its cyclers for PCR. Applera was entitled to seek to license MJ, and in fashioning an appropriate license, to base its royalty fee for the performance of automated PCR on the sales of thermal cyclers. There is no meaningful difference between licensing an end user to perform automated PCR by basing the royalty on the end user's thermal cycler, and licensing a supplier who would otherwise be inducing that end user's infringement by basing the royalty on the sale of that thermal cycler. Both are within the scope of Applera's patent rights.

**D. Pre–1994 Tying**

 MJ asserts that between 1992 and 1994, Applera's PCR process patent rights were unlawfully tied to thermal cyclers because end users who wished to obtain a license to perform automated PCR in Applera's fields had no way to do so unless they purchased a thermal cycler from Applera itself. As MJ argues, until the Supplier Authorization Program ("SAP") was implemented in May 1994, Applera had no licensing program for suppliers, and thus Applera's own thermal cyclers were the only thermal cyclers "authorized" to perform PCR. As discussed in this Court's previous decisions addressing MJ's tying claims related to the post-May 1994 SAP, "the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into a purchase of a tied product that the buyer either did not want, or might have preferred to purchase elsewhere on different

---

**12.** As discussed in the Ruling on Motion in Limine to Exclude MJ's Evidence and Arguments Claiming PCR Rights are Tied to Authorized Thermal Cyclers [Doc. # 874], Applera's licensing scheme did not require purchasers of PCR process rights to buy unwanted thermal cyclers.

terms." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 12, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). To prevail on a tying claim, MJ must establish that (1) the tying and the tied products are separate and distinct products; (2) the seller has forced purchasers of the tying product to also buy the tied product; and (3) the tie forecloses a substantial volume of commerce in the market for the tied product. *See id.* at 11–16, 104 S.Ct. 1551.

There remain factual disputes as to whether Applera' pre–1994 conduct would constitute an unlawful tie. For example, although MJ has argued that the Court's previous finding that thermal cyclers have

substantial noninfringing uses settles its claim that thermal cyclers and PCR process patent rights are separate products, the test for whether separate products exist in the tying context is distinct, and turns "on the character of the demand for the two items." *Jefferson Parish,* 466 U.S. at 19, 104 S.Ct. 1551. There remains a factual dispute about the demand for thermal cyclers separate and apart from their use for PCR.[13] There remain further factual disputes about the availability and viability of an end user licensing program prior to 1994 for consumers who wished to buy a thermal cycler from a supplier other than Applera,[14] and whether end users

---

**13.** As the Federal Circuit noted in *Senza–Gel Corp. v. Seiffhart,* 803 F.2d 661, 669 (Fed.Cir. 1986), " '[w]hether a producer's combined products should be considered as separate can be decided only by looking at consumer behavior. It is the relationship of the producer's selling decision to market demand, not the physical characteristics of the products alone, that determines the existence of legally separable products.' " (quoting *Klamath–Lake Pharmaceutical Assoc. v. Klamath Medical Service Bureau,* 701 F.2d 1276, 1289 (9th Cir.), *cert. denied,* 464 U.S. 822, 104 S.Ct. 88, 78 L.Ed.2d 96 (1983) (emphasis in original)). Thus, a finding that thermal cyclers had substantial non-infringing uses, while relevant to the issue of consumer demand, does not resolve the demand question. The fact that thermal cyclers preceded the development of the PCR process, for example, does not create any inferences about the nature of the market for thermal cyclers after the development of PCR. Nor does a finding that Applera's cycle sequencing kit sales approached 70% of the annual sales of the PCR business require the conclusion that those thermal cyclers used for cycle sequencing were not also used for PCR; thermal cyclers might commonly be used for both PCR and cycle sequencing. Among the unanswered but relevant questions to market demand are whether new thermal cycler manufacturers entered the market, whether their output has increased, or whether it would be efficient for manufacturers to produce only thermal cyclers that did not need PCR authorization rights.

**14.** MJ argues that end user licenses were unavailable, and cites the following deposition testimony from Joseph Smith, Applera's in-house counsel:

> Q. Okay. So at least until your supplier authorization program [SAP] went into effect, is it correct to say that the only way someone could get a license to do PCR was to use a[n] [Applera] thermal cycler and buy an authorized reagent?
> A. In our field.

Deposition Transcript of Joseph Smith, Jan. 11, 2000 [Doc. # 783, Ex. 23] at 95.

MJ also relies on the trial testimony of Dr. Michael Hunkapiller, who stated that he was not aware of any end user getting an authorization for a non-PE thermal cycler in 1993. *See* Trial Tr. Vol. II [Doc. # 1299] at 452.

Applera disputes the contention that end-user licenses were unavailable before 1994. The evidence in the record that Applera points to includes (1) deposition testimony from its licensing director, Hannelore Fischer, stating that Applera's basic licensing structure was in place when she joined the firm in 1993, *see* Deposition Transcript of Hannelore Fischer, Nov. 4, 1999 [Doc. # 811, Ex. 2] at 296, 392; (2) MJ's disclaimers in its pre–1994 advertisements that stated "[u]sers must obtain a license to perform the reaction, and a license is currently available through either Roche Molecular Systems of Branchburg, New Jersey, or [Applera] of Norwalk, Connecticut," *see* Letter of John Hanson, Director of Special Projects, MJ Research to John Warner, Director of Licensing, Applera Corp.,

were coerced into purchasing Applera thermal cyclers in order to avoid infringement liability.[15]

These factual disputes, however, do not create a triable issue on MJ's monopolization claim, because defendant's pre–1994 tying claim is barred by the statute of limitations, which provides that "[a]ny action to enforce any cause of action under section 15, 15a, or 15c of this title shall be forever barred unless commenced within four years after the cause of action accrued." 15 U.S.C. § 15b. MJ first raised its tying claim in its August 12, 1998 Answer, Affirmative Defenses, and Coun-

terclaims to Applera's patent infringement complaint. Thus, the pre–May, 1994 tying claim, based on conduct occurring before Applera changed its licensing program by introducing the SAP, cannot be an independent basis for finding exclusionary conduct in aid of Applera's post–1994 monopoly.[16]

In prior briefing on this subject,[17] MJ has pointed to two ways in which Applera's pre–1994 conduct may be relevant to its timely commenced antitrust claim. First, MJ has asserted that "the illegal tie that existed between 1992 and 1994 allowed

June 11, 1993 [Doc. # 811, Ex. 4] at PE 012379 (quoting language in MJ marketing packages);" (3) a 1992 letter from Applera to MJ stating "[Applera] is prepared to extend a license under these patents to PCR end-users who choose not to purchase [Applera's] thermal cyclers, but to date [Applera] has had few, if any requests, *see* Letter from John Warner to John Hanson, Oct. 15, 1992 [Doc. # 811, Ex. 7] at PE 012386;" (4) the terms of Applera's 1991 Distribution Agreement with Roche required Applera to grant sublicenses to "end-users who wish to practice the Licensed Process without any requirement that they purchase Products or [Applera] Products," *see* 1991 Distribution Agreement between Roche and [Applera] [Doc. # 811, Ex. 8] at § 4.13(a); (5) the label license on the reagent packages that end users needed in order to perform PCR informed them that the license gave the users the right to perform PCR when used in conjunction with an authorized thermal cycler, and stated that "[f]urther information on purchasing licenses to practice the PCR process may be obtained by contacting the Director of Licensing at [Applera], 850 Lincoln Centre Drive, Foster City, California 94404 . . .", *see* Reagent Label License [Doc. # 811, Ex. 12] at PE 13228. Applera also disputes the implication of Joseph Smith's deposition testimony, noting that he testified he lacked knowledge of Applera's end-user program before 1994. *See* Smith Dep. [Doc. # 811, Ex. 3] at 86–87.

15. Applera did not enforce its "authorization" requirement before it instituted the SAP in mid–1994.

16. The general rule is that "a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research*, 401 U.S. 321, 338, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). Under the doctrine of continuing violation, however, if a "monopolist creates its monopoly by a series of repeated or re-asserted acts designed to maintain its monopoly, the statute of limitations is restarted, provided that the subsequent acts fall within the definition of independent predicate acts," that is, an act that is "not merely a reaffirmation of a previous act and that inflicts new and accumulating injury on the plaintiff." II Areeda & Hovenkamp, *Antitrust Law*, ¶ 320c4 (2000) at 219, 221 (citation and internal quotation marks omitted). In such cases, damages are limited to the four years immediately preceding the filing of the lawsuit. *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189–90, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997). Here, it is clear that the SAP introduced by Applera in 1994 represented a departure from the previous licensing system, and therefore was an independent predicate act.

17. MJ raised the pre–1994 tying issue in its *Motion in Limine* by MJ Research Inc. and Michael and John Finney to Preclude Plaintiffs from Claiming that MJ Has Contributorily Infringed Their Patent Rights, that the PCR Process Rights in PE/Applera's Fields and Thermal Cyclers are Not Separate Products and That the Plaintiffs' Licensing Program was Not a Tie Before 1994 [Doc. # 781].

plaintiffs to monopolize the relevant market and that, after 1994, plaintiffs did nothing to divest this unlawfully acquired monopoly power." Reply Memorandum of Law in Further Support of the Motion in Limine [Doc. # 830] at 8. MJ has also stated that Applera's pre–1994 activity is evidence of its monopolistic intent.

The notion that conduct that is not otherwise actionable might nonetheless be relevant to a claim properly before the court can be found in *Continental Ore Co. v. Union Carbide and Carbon Corp.*, 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962), in which the Supreme Court found that:

> evidence that the conspiracy and monopolization alleged began in the early 1930's, that overt acts in furtherance thereof occurred in the 1930's, and that it was pursuant to this anticompetitive scheme that respondents sought to and did eliminate petitioners from the ... industry after 1938 ... was clearly material to petitioners' charge that there was a conspiracy and monopolization in existence when they came into the industry, and that they were eliminated in furtherance thereof.

*Id.* at 709–10, 82 S.Ct. 1404.

Under the *Continental Ore* doctrine, otherwise unactionable conduct may nonetheless be relevant as evidence of the intent of the entity charged with monopolistic conduct. *See also* II Areeda & Hovenkamp, *Antitrust Law*, ¶ 310c6 (2000) at 147 ("The factfinder should be permitted to consider the entire sum of unlawful exclusionary practices and their impact.... A monopolist bent on preserving its dominant position is likely to engage in repeated and varied exclusionary practices. Each one viewed in isolation might be viewed as de minimus or an error in judgment, but the pattern gives increased plausibility to the

claim."). The otherwise unactionable conduct must not overtake the dominant claim, however. Importantly, "all the elements of the offense must still be proven for the case at hand." *Id.* at 146. As Professor Hovenkamp counsels, "elements unrelated to intent ordinarily cannot be 'transferred' from one situation to another." *Id.*

■ To prove a Section 2 monopolization claim, MJ must show that Applera willfully acquired and maintained monopoly power in the thermal cycler market through exclusionary conduct. Thus, while MJ's offer of evidence of Applera's pre–1994 conduct would be relevant on the issue of whether Applera's acquisition or maintenance of monopoly power was willful, it is not relevant to prove the existence of post–1994 exclusionary conduct. Because Applera's SAP introduced in 1994 was an entirely new and different licensing program than that which existed previously, MJ must prove independently that Applera acquired or maintained its monopoly power because of this post–1994 conduct.

MJ seeks a standard which shifts the burden of proof based on a showing of pre–1994 monopolization. It is enough, MJ argues, to demonstrate that after 1994, "plaintiffs did nothing to divest this unlawfully acquired monopoly power." Reply Mem. [Doc. # 830] at 8. In support, MJ cites *dicta* in *United States v. Aluminum Co. of America*, 148 F.2d 416, 427 (2d Cir.1945), which states, "[H]aving proved that 'Alcoa' had a monopoly of the domestic ingot market, the plaintiff had gone far enough; if it was an excuse, that 'Alcoa' had not abused its power, it lay upon 'Alcoa' to prove that it had not." *Alcoa* did not address the impact of time-barred exclusionary conduct, and instead dealt with the entirely separate question of whether a monopolizer can escape liability

by acting fairly and not abusing its monopoly power. It thus has no bearing on the predicate question at issue here of whether a monopoly was acquired or maintained through exclusionary conduct. The burden remains on MJ to show that Applera's post–1994 conduct created or perpetuated a monopoly. Evidence of a pre–1994 tie, while relevant to demonstrate the willfulness of Applera's later conduct, cannot form the basis of its monopolization claim absent some evidence that the post–1994 SAP was exclusionary.

### E. Post–1994 Intent

█ What MJ is left with is its claim that its evidence of Applera's anticompetitive intent alone can support a finding of exclusionary conduct.[18] MJ relies on the Second Circuit's observation that "[d]istinguishing between efficient and predatory conduct is extremely difficult because it is frequently the case that competitive and exclusionary conduct look alike. Evidence of intent and effect helps the trier of fact to evaluate the actual effect of challenged business practices ...." *United States Football League v. Nat'l Football League,* 842 F.2d 1335, 1359 (2d Cir.1988) (citations omitted, emphasis deleted). The nature of a patent grant is exclusionary, however. What is relevant in cases at the intersection of patent and antitrust law is whether the conduct somehow exceeds the scope of the patent grant, and where, as here, this question is answered in the negative using objective measures, there is no basis for inquiring into the patent holder's subjective motivation for exerting his statutory rights. *See In re Indep. Serv. Organizations,* 203 F.3d at 1327–28 ("It is the infringement defendant and not the patentee that bears the burden to show that one of these exceptional situations (for finding improper exclusionary conduct) exists and, in the absence of such proof, we will not inquire into the patentee's motivations for asserting his statutory right to exclude.").

### IV. Conclusion

For the foregoing reasons, MJ's Motion for Summary Judgment Din its Favor on the Claims of Monopolization, Attempted Monopolization and Conspiracy to Monopolize [Doc. # 1137] is DENIED, and Plaintiffs' Cross Motion for Summary Judgment on MJ Research Inc.'s Claims of Monopolization, Attempted Monopolization and

---

**18.** MJ's evidence of anticompetitive intent consists of Applera's FY' 95 Marketing Plan, which stated its intention to "re-establish [Applera's] dominant position," and indicated that its SAP was expected to result in a "stabilization in the cycler market, will probably discourage any other suppliers from entering the market and will probably increase base prices for competitive instruments." *See* FY '95 Marketing Plan: PCR Instruments and Consumables [Doc. # 1140, Ex. 2] at PE 025390. MJ also proffers an Applera document prepared for a 1995 planning meeting, stating its intention to "continue to use patent position to stabilize market, generate income, and gain access to complementary technologies." *See* PCR Products: FY95 Planning Meeting, Feb. 16, 1994 [Doc. # 1140, Ex. 1] at PE 026132. MJ asserts that Applera has never offered a business justification for its change in licensing program to require "authorized" thermal cyclers when prior to 1992, end users could become fully licensed to perform PCR through the purchase of licensed reagents.

MJ also argues that Applera's delay in producing four 1992 documents concerning Applera's consideration of licensing alternatives should result in the sanction of precluding Applera from denying that the intent behind the SAP was the monopolization of the market for thermal cyclers. The Court previously granted MJ's motion to exclude these documents. Given the Court's finding that intent alone cannot support MJ's monopolization claim, and that the SAP has not been shown to be exclusionary, the sanction MJ seeks would not impact the result in this case, and thus it is not necessary to reach the issue.

Conspiracy to Monopolize [Doc. # 1180] is GRANTED.

IT IS SO ORDERED.